UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | | |
|---|---|---|
| MICHAEL L. COUCH, | * | CIV 12-3029-RAL |
| Plaintiff, | * | |
| vs. | * | OPINION AND ORDER |
| | * | GRANTING DEFENDANT'S |
| CRAIG LYON, d/b/a RCA HUNTING | * | MOTION FOR SUMMARY |
| SERVICE, and DALE BOHN, | * | JUDGMENT |
| Defendants. | * | |

## I. INTRODUCTION

Plaintiff Michael Couch ("Couch") filed a Complaint, Doc. 1, against Defendants Craig Lyon ("Lyon"), doing business as RCA Hunting Service ("RCA Hunting"), and Dale Bohn ("Bohn") for injuries Couch suffered when shot by Bohn on a guided pheasant hunt led by Lyon. Lyon filed a Motion for Summary Judgment, Doc. 15, which Couch opposes, Doc. 19. For the reasons stated below, Lyon's motion is granted.

## II. FACTS

Lyon operates RCA Hunting to provide guided hunts primarily for pheasant and deer around Gregory, South Dakota. Doc. 17 at ¶¶ 1-2; Doc. 20 at ¶ 1. Couch is a retired police captain with extensive firearms training as well as an experienced hunter who at the time of the injury was a resident of Missouri and now resides in Florida. Doc. 17 at ¶¶ 4-6, 13; Doc. 20 at ¶ 1; Doc. 16-3 at 1.

In September of 2009, Couch joined Lyon and RCA Hunting for a guided deer hunt. Doc. 17 at ¶ 3; Doc. 20 at ¶ 1. On September 16, 2009, prior to embarking on the deer hunt,

Couch signed a Waiver and Release Agreement ("the Agreement"). Doc. 17 at ¶¶ 9, 11; Doc 20 at ¶ 1. The full text of the Agreement stated as follows:

> In consideration for my being permitted to participate in the activities of Craig Lyon, DBA RCA Hunting, I agree to the following Waiver and Release:
>
> I acknowledge that hunting and/or target shooting has inherent risks, hazards, and dangers for anyone, that cannot be eliminated, particularly in a wilderness environment. I UNDERSTAND THAT THESE RISKS, HAZARDS, AND DANGERS INCLUDE WITHOUT LIMITATION:
>
> 1. The risk of handling firearms and being near others that have firearms in their possession;
> 2. The risk of injury from ammunition and shot from other guns;
> 3. Walking in rugged country, including encounters with wildlife, animals and insects;
> 4. Inclement weather conditions;
> 5. The risk of injury from riding on an all terrain vehicle (ATV) or any vehicle used off the paved road;
> 6. The risk of injury from the use of tree stands;
>
> I understand the risks, hazards, and dangers as described above and have had the opportunity to discuss them with Craig Lyon. ... My participation in this activity is purely voluntary. No one is forcing me to participate and I elect to participate in spite of the risks. I AM VOLUNTARILY USING THE SERVICES OF Craig Lyon, DBA RCA Hunting WITH FULL KNOWLEDGE OF THE INHERENT RISKS, HAZARDS, AND DANGERS INVOLVED AND HEREBY ASSUME AND ACCEPT ANY AND ALL RISKS OF INJURY, PARALYSIS, OR DEATH.
>
> Lastly, I, for myself, my heirs, successors, executors, and subrogees, hereby KNOWINGLY AND INTENTIONALLY WAIVE AND RELEASE, INDEMNIFY AND HOLD HARMLESS Craig Lyon DBA RCA Hunting, their directors, officers, agents, employees, and volunteers from and against any and all claims, actions, causes of action, liabilities, suits, expenses (including reasonable attorneys' fees) which are related to, arise out of, or are in any way connected with my participation in this

> activity including, but not limited to, NEGLIGENCE of any kind or nature, whether foreseen or unforeseen, arising directly or indirectly out of any damage, loss, injury, paralysis, or death to me or my property as a result of my engaging in these activities or the use of these services, animals or equipment, whether such damage, loss, injury, paralysis, or death results from negligence of Craig Lyon, DBA RCA Hunting or from some other cause. I, for myself, my heirs, my successors, executors, and subrogees, further agree not to sue Craig Lyon, DBA RCA Hunting as a result of any injury, paralysis, or death suffered in connection with my use and participation in the activities of Craig Lyon, DBA RCA Hunting.

Doc. 16-4 at 1-2. Couch signed the Agreement on September 16, 2009, directly under a closing admonition stating "I HAVE CAREFULLY READ, CLEARLY UNDERSTAND, AND VOLUNTARILY SIGN THIS WAIVER AND RELEASE AGREEMENT." Doc. 16-4.

Lyon accompanied Couch on the deer hunt. Doc. 17 at ¶¶ 7-8; Doc. 20 at ¶ 1. Couch harvested a deer on the hunt, but Lyon did not charge Couch his typical guide fee. Doc. 17 at ¶¶ 7-8; Doc. 20 at ¶ 1. After the successful hunt, Couch traveled home to Missouri. Doc. 17 at ¶ 13; Doc. 20 at ¶ 1. Couch, however, returned to South Dakota in October of 2009 because he "wanted to help [Lyon] out for helping [him] out" with the deer hunt. Doc. 17 at ¶¶ 15-16; Doc. 20 at ¶ 1. Couch was not paid and was not acting as an employee, but was helping out around camp, cleaning, and maybe driving the bus in exchange for Lyon having helped Couch out. Doc. 17 at ¶¶ 15-16, 18-19; Doc. 20 at ¶ 1; Doc. 16-2 at 4. Besides, Couch is an "outdoorsman" who "enjoy[s] being outside." Doc. 16-2 at 9.

Lyon had contracted to provide a guided pheasant hunt in October of 2009 for a group of out-of-state hunters called the "Kincaid Group." Doc. 17 at ¶ 20; Doc. 20 at ¶ 3. The Kincaid Group arrived on October 8, 2009, and began their hunt the next day led by Lyon with Couch

present. See Doc. 17 at ¶¶ 14, 21, 23; Doc. 20 at ¶¶ 1, 3. Couch recalls that before the first day of hunting on the morning of October 9, 2009, Lyon told Couch that all the hunters in the Kincaid Group were seasoned and safe hunters. Doc. 16-3 at 2; Doc. 16-2 at 9.[1] No one was injured during the first day's hunt, but after the hunt, the group chastised one hunter, Defendant Dale Bohn ("Bohn"), for excessive shooting and shooting outside of his hunting lane. Doc. 17 at ¶¶ 20-21; Doc. 16-2 at 5; Doc. 20 at ¶ 5. Couch was present on October 9, 2009, when the group was discussing Bohn's unsafe hunting practices and he heard the group criticize Bohn. Doc. 17 at ¶ 22; Doc. 20 at ¶ 5.

On October 10, 2009, the Kincaid Group went hunting again. Before hunting the first field, Lyon instructed the Kincaid Group on hunting safety. Doc. 17 at ¶¶ 23-24; Doc. 20 at ¶ 5. Lyon told the hunters to be safe, not to shoot at low birds, and to always wear hunter's orange clothing. Doc. 17 at ¶¶ 23-24; Doc. 20 at ¶ 5. After hunting several fields, the Kincaid Group began hunting a ditch with heavy brush. Doc. 17 at ¶ 26; Doc. 20 at ¶ 5. Couch was in a line of walkers with Lyon in the middle to run the dogs, Couch next to Lyon trying to scare up birds as he walked, and the Kincaid Group members occupying other positions. Doc. 17 at ¶¶ 26-27; Doc. 16-2 at 6-7; Doc. 20 at ¶¶ 6-7. Bohn had taken up a position as a blocker ahead of but facing the advancing line of walkers, including Couch, who were attempting to push birds toward the blockers. Doc. 17 at ¶¶ 26-27; Doc. 16-2 at 6-7; Doc. 20 at ¶¶ 6-7. As the walkers

---

[1] There was confusion regarding when Lyon told Couch that the hunters in the Kincaid Group were "safe and seasoned hunters." Doc. 16-2 at 9. Couch's interrogatories placed this conversation before the second day's hunt on the morning of October 10, 2009. Doc. 16-3 at 2. However, at Couch's deposition, he clarified this. Couch stated that Lyon assured him on the morning of October 9, 2009, before the first hunt, that the hunters were safe hunters. Doc. 16-2 at 9. Later on the first day, in the afternoon of October 9, 2009, Couch heard the group admonish Bohn for his unsafe hunting practices. Doc. 16-2 at 9.

approached, Bohn moved from his position, kicked a brush pile, and a pheasant flew up. Doc. 17 at ¶¶ 28-29; Doc. 20 at ¶ 8. The pheasant flew low from the area near Bohn toward Couch ultimately passing over Couch's head. Doc. 17 at ¶ 29; Doc. 16-2 at 7. Couch saw Bohn shoulder his shotgun and aim at the bird. Doc. 17 at ¶¶ 29-30; Doc. 16-2 at 7. Couch turned away from Bohn, but shot from Bohn's shotgun struck Couch in the back of his head. Doc. 17 at ¶¶ 29-30; Doc. 16-2 at 7-8. Couch was taken by ambulance to the hospital in Gregory. Doc. 16-3 at 2-3.

On October 9, 2012, just under three years after the incident, Couch filed a Complaint, Doc. 1, against Lyon, doing business as RCA Hunting, and Bohn. The Complaint alleges that Lyon negligently failed to instruct the Kincaid Group to stay in line, not to shoot at low birds, and not to shoot toward other persons. Doc. 1 at ¶ 1. The Complaint also alleges that Bohn had a duty to hunt in a safe manner and breached that duty by shooting at a low bird and toward Couch. Doc. 1 at ¶¶ 1-2. Couch claims that the negligence of Lyon and Bohn caused him to be shot and to have suffered excruciating pain, permanent impairment, mental and emotional anguish, loss of life's pursuits, loss of income, and medical expenses. Doc. 1 at ¶ 2.

### III. DISCUSSION

Lyon makes two arguments in support of his motion for summary judgment. Lyon argues that the Agreement's Waiver and Release that Couch signed before the deer hunt bars his recovery for injuries he suffered during the subsequent pheasant hunt. Doc. 21 at 6. Alternatively, Lyon argues that Couch assumed the risk of the injury when he decided to hunt and assumed the specific risk of Bohn's negligent hunting because Couch was aware that Bohn was an unsafe hunter prior to participating in the second day of the hunt. Doc. 18 at 11-12. This

Court grants summary judgment to Lyon on the first argument but not on the second argument.

### A. Summary Judgment Standard and Choice of Law

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is not "a disfavored procedural shortcut, but rather . . . an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). On summary judgment, courts view "the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." E.E.O.C. v. CRST Van Expedited, Inc., 679 F.3d 657, 686 (8th Cir. 2012) (quoting Mayer v. Countrywide Home Loans, 647 F.3d 789, 791 (8th Cir. 2011)). A party opposing a properly made and supported motion for summary judgment must cite to particular materials in the record supporting the assertion that a fact is genuinely disputed. Fed. R. Civ. P. 56(c)(1); see also Gacek v. Owens & Minor Distrib., Inc., 666 F.3d 1142, 1145 (8th Cir. 2012). The substantive law of South Dakota applies in this diversity action because South Dakota is the law with the most significant relationship to the negligence claim. See PCL Const. Servs., Inc. v. B & H Contractors of S. Dakota, Inc., No. 11-4035-KES, 2013 WL 1866922, at *3 (D.S.D. May 2, 2013) (stating that South Dakota employs the most significant relationship test in diversity tort cases).

### B. Waiver and Release

Lyon argues that the waiver is unambiguous and the injury Couch suffered resulted from an activity within its scope. Doc. 21 at 8. Couch concedes that the waiver is valid and does not

argue that it is unconscionable. Doc. 19 at 1.[2] Couch argues, however, that the "release was effective only to a particular known risk (deer hunting), during a particular time period (the duration of the deer hunt)." Doc. 19 at 1-2. Couch argues that in the "absence of a clause . . . that states for how long the release is effective. . . , the intent must be construed as to be effective only for the duration of one particular, packaged hunt." Doc. 19 at 1-2 (stating that Couch does not dispute the validity of the release but that "[w]hat is in dispute is how long the original release was valid").

A release is contractual in nature and is governed by contract law. Johnson v. Rapid City Softball Ass'n, 514 N.W.2d 693, 697 (S.D. 1994). When interpreting a contract, "[t]he goal . . . is to see that the mutual intent of the parties is carried into effect." Nelson v. Schellpfeffer, 656 N.W.2d 740, 743 (S.D. 2003). To determine the parties' intent, courts look to the language of the contract, Roseth v. Roseth, 829 N.W.2d 136, 142 (S.D. 2013), and afford terms their "plain and ordinary meaning," Bunkers v. Jacobson, 653 N.W.2d 732, 738 (S.D. 2002) (citation and quotation marks omitted). "When the meaning of contractual language is plain and unambiguous, construction is not necessary" because the "intent of the parties can be derived

---

[2] Couch asserts in his Response Brief that Lyon requested Couch to sign the release anew on the morning of October 9, 2009, and that such a request is evidence that the parties understood the release to apply only to the prior deer hunt. Doc. 19 at 2. There is nothing in the excerpts of Couch's deposition testimony or interrogatories to support this assertion. Rule 56(c)(1) of the Federal Rules of Civil Procedure requires that a party "asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, . . . affidavits or declarations, . . . admissions, interrogatory answers, or other materials." Local Rule 56.1(C) of the Civil Local Rules of Practice of the United States District Court for the District of South Dakota requires that "[a] party shall attach to an affidavit all relevant documentary evidence in support of or in opposition to a motion for summary judgment." Couch has failed to comply with these rules with respect to the assertion that Lyon requested him to sign another release on October 9, 2009.

from within the four corners of the contract." Roseth, 829 N.W.2d at 142 (citation omitted); see also Nelson, 656 N.W.2d at 743 ("When the words of a contract are clear and explicit and lead to no absurd consequences, the search for the parties' common intent is at an end."). A contract is not rendered ambiguous simply because a party thereafter does not agree on the contract's meaning or on the parties' intent upon agreeing to the contract. Roseth, 829 N.W.2d at 142. "Instead, 'a contract is ambiguous only when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" Id. (quoting Vander Heide v. Boke Ranch, Inc., 736 N.W.2d 824, 836 (S.D. 2007)). If the contract's language is found to be ambiguous, parol evidence is admissible to explain the contract but inadmissible to vary or add terms to the contract. Id.

The Agreement at issue is not ambiguous. The Agreement begins by stating that the release is "[i]n consideration for [Couch] being permitted to participate in the activities of Craig Lyon [d/b/a] RCA Hunting." Doc. 16-4. The Agreement is extensive and explicit in describing dangers associated with hunting and in releasing any claim that Couch has against Lyon arising from "the activities." No part of the release is restricted just to deer hunting and not to pheasant hunting, and no language in the release supports an interpretation that the release would apply just to a deer hunt in September of 2009 and not to a pheasant hunt in October of 2009. Rather, the release is general in nature. The release describes risks relating to "hunting and/or target shooting, . . . the risk of handling firearms and being near others that have firearms," and "the risk of injury from ammunition and shot from other guns." Doc. 16-4. The Agreement then specifically releases Lyon and RCA Hunting from any claim or injury in connection with Couch's "participation in the activities of Craig Lyon [d/b/a] RCA Hunting." Doc. 16-4.

The use of the word "activities" in the Agreement does not give rise to an ambiguity. The South Dakota Supreme Court has upheld a broad pre-injury release that exculpated a party for injuries resulting from all "activities." See Lee v. Beauchene, 337 N.W.2d 827, 827-29 (S.D. 1983) (per curiam) (upholding release applying to any claim that "arises out of my activities or presence in the restricted area"); see also Holzer v. Dakota Speedway, 610 N.W.2d 791, 794 (S.D. 2000) (upholding release exculpating defendant for any injury "arising out of or related to the events" at the defendant's place of business). Courts outside of South Dakota routinely enforce broad pre-injury releases and do not require specific risks to be included in the waiver so long as the injury is within the scope of the release. See e.g., Squires v. Breckenridge Outdoor Educ. Ctr., 715 F.3d 867, 873 (10th Cir. 2013) (upholding a release exculpating a party from injuries that occurred from any "activity" and noting that "Colorado law does not require that exculpatory agreements refer to the specific activity in which the plaintiff participated and was injured"); Brush v. Jiminy Peak Mountain Resort, Inc., 626 F. Supp. 2d 139, 146, 150-51 (D. Mass. 2009) (holding that release exculpating a ski group from any injuries that result from the group's "Activities" was unambiguous and enforceable against a racer injured in a race affiliated with the group).

There is no genuine dispute of material fact that Couch's injury arises out of participating in Lyon's hunting activities in October of 2009, but Couch argues that the Agreement should be confined to cover only hunting activities in September of 2009. Here, the Agreement's use of the word "activities" in conjunction with language applying generally to the risk of hunting is sufficient to cover both the activity of deer hunting in September and pheasant hunting in October. Similarly broad releases have been upheld in South Dakota, the Agreement is not

limited textually as to the animal being hunted, and the Agreement is not rendered ambiguous by Couch's arguing in his brief that the parties intent was for the release to apply only to the deer hunt. See Roseth, 829 N.W.2d at 142 (stating that a contract is not ambiguous simply because the parties later disagree on their intent at its formation).

Couch nevertheless argues that the timing of the signing of the Agreement makes it apply only to the four-day deer hunt in September and not to a subsequent pheasant hunt a month later. The language of the Agreement does not confine the release to any activity or injury within days of its signing. Of course, the signing of a release need not be contemporaneous to an injury for a release to cover that injury. See e.g., Sharon v. City of Newton, 769 N.E.2d 738, 741-43 (Mass. 2002) (enforcing release signed by parent of a minor child three months before injury occurred). There are two cases from outside of South Dakota that contain somewhat analogous facts to Couch's case and illustrate this point. In Lund v. Bally's Aerobic Plus, Inc., 78 Cal. App. 4th 733 (Cal Ct. App. 2000), ten months after joining a gym and signing a release, the plaintiff contracted for additional personal training services that the gym offered and was injured in her first personal training session. Id. at 735-36. The California Court of Appeals held that the original release barred recovery, although it had been signed ten months prior to the injury and the injury occurred when the plaintiff was using additional services she did not contract for at the time she signed the release. Id. at 738-39. Because the injury resulted from an activity encompassed by the release's plain language, the release still applied. Id.

Similarly in Paralift, Inc. v. Superior Court, 23 Cal. App. 4th 748 (Cal. Ct. App. 1993), the plaintiff signed a release before a skydive jump in 1999 releasing the skydiving company from liability "forever" for any injuries resulting from "parachute activities." Id. at 752. The

release referenced the place—the Perris Valley Airport—where the company was operating in 2009. Id. at 752. The release did not have an expiration date. Id. After signing the release, the plaintiff intermittently used the skydiving company's services to jump in various areas and not just around the Perris Valley Airport. Id. at 752-53. In 2002, three years after signing the release, the plaintiff was killed during a jump provided by the company in an area different from and more dangerous than the area surrounding the Perris Valley Airport. Id. at 751-53. The California Court of Appeals considered "whether the release applies to the fatal jump event, which took place some three years after the release was signed and in a different location than where the activities covered by the release originally began." Id. at 754. The court held that the release did bar recovery, id. at 757, because the release was "extremely broad in time and scope" and the term "parachuting activities" was "not limited by time or place" and applied to all "parachuting activities," id. at 754.

Here, the Agreement between Couch and Lyon on its plain language is quite broad, albeit not as broad as the release at issue in Paralift. The Agreement applies to injuries resulting from any "activity" that Lyon and RCA Hunting conducted, it is not limited in time or place, and it contains no expiration date. Doc. 16-4. The Agreement's purpose was to release Lyon from any liability for harm to Couch as a result of activities that Lyon and RCA Hunting operated. Doc. 16-4. Couch returned to participate in hunting activities led by Lyon, namely a guided pheasant hunt. Thus, the Agreement bars this suit by Couch against Lyon and RCA Hunting.

Couch cites to Hyson v. White Water Mountain Resorts of Connecticut, Inc., 829 A.2d 827 (Conn. 2003), to argue that a "party cannot be released from future negligence [] in the absence of language that expressly so provides." Doc. 19 at 1. Couch's argument is misplaced.

11

After all, Couch signed the Agreement prior to the deer hunt and even Couch, elsewhere in his argument, acknowledges that the Agreement would have applied if, after its signing, Couch were negligently injured in a hunting activity during the deer hunt. In Hyson, the release at issue referred to "inherent risks" of the activity and contained an indemnification clause, but it did not specifically state that the plaintiff was releasing the defendant for injuries that resulted from the defendant's negligence. Id. at 831. Here, unlike in Hyson, the release expressly states in two separate places that Couch is releasing and indemnifying Lyon and RCA Hunting for injuries that result from negligence by Lyon and RCA Hunting. Doc. 16-4 at 1-2. The Supreme Court of South Dakota has upheld such anticipatory releases releasing defendants for injuries resulting from their own negligence. See e.g., Holzer, 610 N.W.2d at 794.

### C. Assumption of the Risk

Lyon argues that he is entitled to summary judgment because Couch assumed the risk of injury as a matter of law when he decided to engage in activities with Lyon and the Kincaid Group. Doc. 18 at 12. Lyon also argues that Couch assumed the specific risk of being shot by a negligent hunter—Bohn—because Couch knew Bohn was an unsafe hunter and nevertheless walked with the group that day. Doc. 18 at 12-13. Couch opposes summary judgment on this ground by arguing that while he was aware that all of the Kincaid Group had admonished Bohn for careless hunting, Couch did not assume the risk of Bohn's negligence because Lyon had told Couch on October 9, 2009, that all of the Kincaid Group were seasoned hunters and that the Kincaid Group acknowledged that they would hunt in a safe manner on October, 10, 2009. Doc. 19 at 2.

Questions of assumption of the risk and contributory negligence "are for the jury in all but the rarest of cases." Stone v. Von Eye Farms, 741 N.W.2d 767, 770 (S.D. 2007). In South Dakota, assumption of the risk is an affirmative defense to a negligence action. Dodson v. S.D. Dep't. of Human Servs., 703 N.W.2d 353, 355 (S.D. 2005). A person assumes the risk of injury when that person "(1) had actual or constructive knowledge of the risk; (2) appreciated its character; and (3) voluntarily accepted the risk, with the time, knowledge, and experience to make an intelligent choice." Ray v. Downes, 576 N.W.2d 896, 898 (S.D. 1998). "[A]lthough one may assume the risk of the negligence of another if he is fully informed of such negligence, one is not, under the doctrine of assumption of risk, bound to anticipate the negligent conduct of others." Id. at 900 (citation omitted). Under South Dakota law, summary judgment is not proper on an assumption of the risk defense in situations where the plaintiff engages in arguably dangerous behavior, if one defendant's negligence exacerbated the possibility of harm or caused the harm and the plaintiff did not assume the risk that the defendant would act negligently. See id. (holding summary judgment not warranted under assumption of the risk when plaintiff places himself in a dangerous position behind a reversing truck, but when the defendant's alleged negligent failure to stop the truck caused the injury); Wilson v. O'Gorman High Sch., No. 05-4158-KES, 2008 WL 2571833, at *5 (D.S.D. June 26, 2008) (holding summary judgment not warranted under assumption of the risk because the plaintiff-gymnast, who fell during a difficult maneuver, did not assume the risk as a matter of law that her coach would act negligently and place her in a situation of enhanced danger). This is not a proper case for summary judgment on an assumption of the risk defense.

## IV. CONCLUSION

For the foregoing reasons, it is hereby

ORDERED that the Defendant's Motion for Summary Judgment, Doc. 15, is granted. It is further

ORDERED that Plaintiff Couch and Defendant Bohn contact the Court within 14 days of the date of this Opinion and Order to schedule a pretrial conference and motion hearing and trial date.

Dated November 5, 2013.

BY THE COURT:

_____
ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE